UNITED STATES of America, Appellee,

v.

COAST OF MAINE LOBSTER CO.,
INC., et al., Defendants-Appellants.

No. 75–1431.

United States Court of Appeals,
First Circuit.

Argued March 2, 1976.

Decided May 10, 1976.

Rehearing Denied June 25, 1976.

Richard E. Valentino, Saco, Me., with whom George F. Wood and Smith, Elliott, Wood & Nelson, P. A., Saco, Me., were on brief, for defendants-appellants.

John B. Wlodkowski, Asst. U. S. Atty., Portland, Me., with whom Peter Mills, U. S. Atty., Portland, Me., was on brief, for appellee.

Richard L. Thornburgh, Asst. Atty. Gen., Crim. Div., U. S. Dept. of Justice, Washington, D. C., James N. Gabriel, U. S. Atty., District of Massachusetts, Boston, Mass., William J. Deachman, U. S. Atty., District of New Hampshire, Concord, N. H., Lincoln C. Almond, U. S. Atty., District of Rhode Island, Providence, R. I., and Julio Morales Sanchez, Atty., District of Puerto Rico, San Juan, P. R., on supplemental memorandum.

Before COFFIN, Chief Judge, ALDRICH and McENTEE, Circuit Judges.

ALDRICH, Senior Circuit Judge.

Defendants were convicted following a jury trial at Portland, Maine, on some 20 counts of mail and wire fraud, 18 U.S.C. §§ 1341, 1343, involving false promises to ship Maine lobsters nationwide. On appeal the assigned errors all concern matters occurring during trial. Only one appears of any stature. It presents a novel and borderline question of potential prejudice arising from prominent publicity given during trial to statements of the prosecutor's immediate supervisor which, though not referring to a trial in progress, could reasonably be thought to have bearing on it. Because the hazard, being one step removed from that arising from direct comment on a case, is both so resistant to a search for proven prejudice and so easily prevented, we deem this a proper occasion for the exercise of our supervisory power, intending not so much to criticize unthinking conduct in the past as to assure more sensitive conduct in the future.

In the case at hand, defendants had been on trial for a week. The case was to go to the jury on a Monday. On the day before, a Sunday, the United States Attorney, Peter Mills, appeared on a local television broadcast, "At Issue," which had been taped the previous Thursday, the fourth day of trial. In the broadcast, an interview, he expressed his opinion, *inter alia,* that "[p]eople who commit so-called white collar crimes are not considered very apt candidates for much time in jail." Monday morning, the Portland Press Herald, the widely read local newspaper, carried a conspicuous headline across the top of the front page, "Mills: White Collar Criminals Get Off Easy," together with a picture of Mills. There was a byline, "United Press International." The first half of the article, appearing on the front page, was principally addressed to Mills' opinion that white collar criminals, such as those convicted of income tax evasion, received inadequate jail sentences. While expressing his "utmost respect" for the district judge, Mills felt he could properly make known his differences.

Defendant moved for a mistrial. The court thereupon inquired of the jury, collectively, in open court. It first asked if jurors had seen an article in Saturday's newspaper, not here relevant, and reminded the jurors of its instruction not to read any articles. There being no response to this query, it asked if any juror had heard the Sunday "At Issue" broadcast, and again received no response. It then inquired if any juror had seen that morning's Portland Press Herald. Again the record indicates "(No response)." The court then asked if any juror had read any article reporting on the United States Attorney's appearance on the Sunday telecast. The vice foreman acknowledged that he had read about it in the morning paper. Another juror then said that she had not read the article but had seen the picture. Further inquiry revealed that "a fair number," estimated by the

court to be seven or eight, had seen the front page and the picture. At this point the court twice asked the jurors whether anyone had read the article, and whether seeing "the picture or anything else" would have any influence on them, and received no response.

So far as the jurors' collective disclaimers are concerned, the record provides no strong basis for confidence that the message of the headline had not been received. Their silent responses, given the total picture, might be thought based less upon full candor than upon a reaction to the court's reminder of their instructions not to read the newspapers. The eventual admission that seven or eight had seen the picture and the front page, which necessarily included the headline, gives us pause. We may well wonder under the circumstances how many, after seeing the head, resolutely put the paper down. Cf. *Henslee v. United States*, 5 Cir., 1957, 246 F.2d 190, 193, *cert. denied*, 359 U.S. 984, 79 S.Ct. 942, 3 L.Ed.2d 933 (reversal though no juror admitted having seen newspaper).

Our analysis of the out of court publicity in this case is aided by no precise parallel in other cases. The article made no reference to the defendants or to the pending trial. We confidently assume that this was not an occasion where a prosecutor was seeking a public forum in which to try to influence the jury's verdict. The gist of the article itself was concerned with sentencing, the judge's function. Nor are we implying that prosecutors should not have different views from those of the district judge, or express them publicly and in critical terms. *Cf. Bridges v. California*, 1941, 314 U.S. 252, 62 S.Ct. 190, 86 L.Ed. 192.

Here, however, we deal with publicity over which the chief prosecutor had control both as to subject matter and timing. *Cf. Henslee v. United States*, ante, at 193. ("A much higher standard prevails" when prosecutor responsible for publicity.) In this case the prosecution of the defendants was the only federal criminal proceeding taking place in the district, and had been so for a week. The alleged crime was mail fraud, a white collar crime. The United States Attorney was well known to the jurors, who had been in service since January, the instant trial being held in July. The banner headline "White Collar Criminals Get Off Easy," accompanied by the picture, had the potential (a) of making a juror think of the case before him as one of a class in which there had been excessive leniency, and a challenge to exhibit appropriate toughness; (b) of perhaps increasing a juror's willingness to convict if he thought a lenient sentence might be imposed; and (c) of making a juror feel that public attention, because of the article, would be more sharply and critically directed to the ultimate verdict in the case at hand. Had a juror read the article itself, as the vice foreman at one point said he had, he might also be tempted, by the assertion of one's right to differ from the judge, not to follow faithfully the instructions. All of this is in the conjectural area of potential for prejudice. But the danger of prejudice can best be avoided if prosecutors are more sensitive to the possible impact of any public statements made by them during a trial.

The ABA Standards Relating to the Prosecution Function and the Defense Function, Approved Draft, 1971, set forth the following standards as to public statements, § 1.3: "(a) The prosecutor should not exploit his office by means of personal publicity connected with a case before trial, during trial and thereafter. (b) The prosecutor should comply with the ABA Standards on Fair Trial and Free Press." The ABA Standards Relating to Fair Trial and Free Press, Approved Draft, 1968, § 1.1, recommended that "During the trial of any criminal matter . . . no lawyer associated with the prosecution or defense shall give or authorize any extrajudicial statement or interview, relating to the trial or the parties or *issues in the trial* . . . ." [Emphasis ours.] The commentary on this section, *id.* at 92, reads: "The reasons for this broad prohibition on the attorney as an officer of the court should be readily apparent. His proper function at this point is to present his case in the courtroom, not to make extrajudicial statements interpreting or ex-

plaining the evidence, anticipating his own or his adversary's strategy, *or attempting to build a favorable climate of opinion.* Moreover, the period of trial in a case that has aroused public attention is the most critical from the standpoint of potential prejudice." *See, generally, Berger v. United States,* 1935 295 U.S. 78, 55 S.Ct. 629, 79 L.Ed. 1314. *See also* A.B.A. Code of Professional Responsibility, July 1, 1969, Final Draft, DR 7–107(D).

While "issues in the trial" and "build a favorable climate" apply most obviously to references to the concrete facts and issues of a particular case, the potential for prejudice can also be triggered by a publicized opinion on an issue, more generally expressed but likely to be associated in the public mind with the issues posed by a trial in progress. For example, a prosecutor's views on mercy killings would not likely be insulated by the absence of specific reference to an active prosecution against a doctor.

■ We do not hold that the article, in spite of its timing, was sufficiently prejudicial to cause the trial to be constitutionally unfair. There was no certainty, perhaps no more than a possibility, that the jury would be affected. We realize that our opinion may be construed by prosecutors as chilling their own freedom of speech and by defense counsel as a hunting license to seek out any published statements, present or past, of anyone associated, however indirectly, with the prosecution of his client. It therefore behooves us to emphasize the narrowness of the rule we announce today and clearly to state the conditions under which we will exercise our supervisory power and set aside a conviction in a case similar to the one at bar. The following factors are critical: the timing of the statement, the relationship of the prosecutor to the criminal trial, the prominence of the public statement, and the relationship of the published views to the issues in the prosecution.

■ The timing of the prosecutor's statement is particularly critical. We do not intend to foreclose a prosecutor from making public statements regarding questions of law enforcement when he is not associated with a pending criminal trial. We say this even though we recognize that a newspaper always may resurrect one of prosecutor's previous statements at a poignant moment. *Cf. Gorin v. United States,* 1 Cir., 1963, 313 F.2d 641, 647, *cert. denied,* 374 U.S. 829, 83 S.Ct. 1870, 10 L.Ed.2d 1052. Statements that a prosecutor makes while a trial is pending and which foreseeably may be made public while the trial is pending, however, stand on a different footing. Because of the prosecutor's sensitive position and his duty to ensure a fair trial, we think that any statements made under such conditions must be carefully examined.

■ It follows that the rule we announce is necessarily confined to the statements of a prosecutor who is closely associated with the particular case, either because of his actual participation in it or because he is known by the jury to be an immediate supervisor of it. To take an extreme example, the Attorney General of the United States is not required to keep silent until such time as no criminal cases are being tried anywhere in the country. The world does not come to a halt because a criminal case is being tried. It is only those who are intimately associated with the ongoing prosecution who are under an obligation to take exceptional steps to avoid prejudicing it.

The final two factors go to the prejudicial effect of the statement as published. The prominence of the publicity is important because it, more than anything else, affects the likelihood of prejudice to the criminal defendant. An obscure item on the inside pages of a newspaper, it needs hardly be said, is less likely to place pressure on a jury than a banner headline on the front page. Finally, the nexus between the views as published and the issues in the pending trial must be close enough so that a reasonable person might see an obvious connection. If the views are general or the nexus remote or strained, the potential for prejudice is not realistic.

■ Here, the supervising prosecutor, who was known as such to the jury, made a

public statement in the media while the trial was pending; the statement was given even further prominence in the newspaper during the trial and communicated to the majority of the jury; and it singled out for tougher treatment the very species of criminal cases that the jury was being called upon to decide. We think the integrity of the trial was needlessly impugned. In such circumstances the chief prosecutor goes public during trial at considerable risk. A majority of this court, as previously constituted, tolerated it once. *Calo v. United States*, 1 Cir., 1964, 338 F.2d 793. Once was enough. In the exercise of our supervisory power we vacate the judgment and order a new trial.

*Vacated and remanded.*

PER CURIAM.

The government has filed a petition for rehearing. It concludes,

"If the prosecutor had known that the Singer case was going to the jury on Monday, and if the prosecutor had known that the Portland Press Herald was going to make a front-page story out of his remarks, and if the prosecutor had known that the story would focus on 'white-collar crime', and if the prosecutor had known that his reference to that phrase would later be coupled to the Singer case, one would have to say that the prosecutor's control was indiscreet, to say the least. We submit, however, that none of these conditions applied here and that the timing of the regrettable publicity was wholly beyond the prosecutor's control."

We divide this in two parts.

*Timing.* It appears from the petition that the trial commenced on Monday, July 14; that on Thursday, July 17, the chief prosecutor, Mr. Mills, was interviewed as a "guest personality" by members of the media; that the interview was taped for subsequent broadcast; that Mr. Mills expected, or concededly, should have expected, that the broadcast "probably" would occur on Sunday, July 20; that the case went to the jury on Monday, following the newspaper publication; that on one occasion, six months prior, the court had submitted a case to the jury on a Saturday morning.

On this basis, with all due respect to the government, we cannot accept the claim that the "timing . . . was wholly beyond the prosecutor's control." There was no obligation on Mr. Mills' part, at least vis-a-vis the government, to appear as a guest speaker on this particular Thursday. On his own concession, release the following Sunday was probable, and, obviously, the next morning was when the broadcast would be reported in the press. There is no suggestion in the petition that he thought on Thursday that the case would go to the jury on Friday. Courts do not normally sit Saturdays. There is no suggestion that he in fact thought there would be an exception made in this case. Hence, rather than being beyond control, the timing of what the government concedes was regrettable publicity, was entirely foreseeable.

*Subject Matter.* The petition alleges that Mr. Mills "had . . . only minimal or incidental control over the televised interview." But clearly he had control over whether he gave the interview or not. Nor can it be thought that he did not have control over what he said. Equally difficult to understand is the allegation that he "had no control over the subject matter of the newspaper publicity." There is no claim of misquotation. The only contention is that the newspaper emphasized ("zeroed in on") some particular remarks. One would be highly unsophisticated to suppose that a paper does not find some remarks more newsworthy than others.

In sum, the petition does not support its above quoted conclusion, either as to timeliness, or as to subject matter. The most that could be said is that Mr. Mills may not have expected front page publicity. But we would be the last to suggest that a newspaper, assuming that something is printable, cannot choose the place and the manner. The petition almost suggests that we are interfering with a free press. A careful reading of our opinion shows that we said the reverse. It is because of the

rights of the press that the prosecutor must choose a time to speak that will not interfere with his obligation of fairness to defendants.

 This would be the end of the matter were it not for the content of a memorandum filed by the Department of Justice and the United States Attorneys elsewhere in this circuit which shows a misconception of what we have held. There is a vast difference between a United States Attorney's "keeping the public informed on the general administration of federal criminal justice in his district," and telling a jury that a particular judge before whom it is sitting imposes inadequate sentences in the type of case they are hearing. It is hornbook law that a judge cannot inform a jury in advance of the sentence he will impose. *United States v. Glick,* 2 Cir., 1972, 463 F.2d 491, 494; *Demetree v. United States,* 5 Cir., 1953, 207 F.2d 892, 895-96.[1] For reasons pointed out in our opinion, it may be even worse for the prosecutor to state that the sentence will be too small.

■ To answer the Department's memorandum, we would say the same thing, whether it be in a small district, or a large one. But by the same token, on rereading our opinion, we see no basis for saying that we have imposed a "gag rule" in any district. A United States Attorney is free at any time, for example, to state that the government is going to make a point of prosecuting white collar crimes. The difficulty came from what he added.

Axiomatically, as reflected in the American Bar Association Standards cited in our main opinion, a prosecutor must "not give . . . any extrajudicial statement or interview, relating to the trial or the parties or issues in the trial." In our opinion we have merely . applied this proscription to views which, though not explicit references, are fraught with the same possibility of influencing the jury.[2] This must include

possibly jury-influencing statements about the judge. We cannot believe the government's memorandum that in a large district there may never be a time when such remarks may be made, but if that is so a prosecutor's obligation to provide a fair trial is more important than a right to publicize his opinions.

*The petition for rehearing is denied.*

---

1. *See also Fryson v. State,* 1973, 17 Md.App. 320, 301 A.2d 211 (reversible error for prosecutor to inform jury that defendant might receive probation or be paroled).

2. Indeed improper explicit references may in some circumstances result in personal liability of the prosecutor. *Cf. Martin v. Merola,* 2 Cir. 1976, 532 F.2d 191, 195 (Lumbard, C. J., concurring).