Lanny HANSCOMB, Petitioner,

v.

Larry MEACHUM, Respondent.

Civ. A. No. 76–642–T.

United States District Court,
D. Massachusetts.

Aug. 19, 1977.

James M. Pool, Boston, Mass., for petitioner.

Terence M. Troyer, Asst. Atty. Gen., Boston, Mass., for respondent.

## MEMORANDUM

TAURO, District Judge.

This is a habeas corpus petition brought pursuant to 28 U.S.C. § 2254 in which the

petitioner seeks relief from a four count conviction in the Suffolk Superior Court for rape, kidnapping, armed robbery and unnatural acts. He claims that his right to a fair trial was undermined by the exposure of the jurors to publicity given a statement made by then Superior Court Chief Justice McLaughlin. The statement was made to a separate set of jurors who returned a verdict of not guilty following an unrelated rape trial over which the Chief Justice presided.

Petitioner and the state have submitted the case on the basis of the transcript in the trial court and an article which appeared in the *Boston Globe* concerning the statement of Chief Justice McLaughlin. For the reasons set forth below, the court denies the issuance of the writ.

## I

The court finds the following facts. From May 16 to 20, 1974, petitioner was tried before Judge Roy and a jury. The jury found him guilty of rape, armed robbery, unnatural acts and kidnapping, and the judge sentenced him to a term of ten to twenty years for rape, with concurrent lesser terms for the other offenses.

At the trial, the alleged victim testified that she woke between 4 and 5 a. m. on June 14, 1973, and observed the petitioner standing at the foot of her bed, naked and holding a knife. She testified that petitioner raped her and forced her to commit various sexual acts. The victim testified that the petitioner then wanted to go for a ride, so they took her car, and drove toward downtown. She testified that she was frightened. When petitioner stopped the car near the Prudential Center, and got out, she jumped into the driver's seat and drove away. She testified that she had first met petitioner in September 1972 when he helped her move a chair into her apartment, but she did not know his name and did not recall seeing him since September, although he lived in another apartment in the same building.

Petitioner testified that on June 14, 1973, the complainant invited him to her apartment for a drink at about 10:00 or 10:30 p. m. When he left, he asked her to hold some money for him while he went out for a drink at a local bar. He testified that he returned to her apartment at about 1:30 a. m. and asked for the money but she refused to give it back. He testified that he was not in an automobile with complainant at any time, and that he had no sexual contact with her that evening. Petitioner left for Canada the next morning. He voluntarily turned himself in to the police in mid-July, upon his return from Canada.

On Saturday and Sunday, May 18 and 19, after the evidence in petitioner's case was closed, and while the jury was recessed, the disputed article appeared in the *Boston Globe* (See appendix).[1] It reported that Chief Justice McLaughlin of the Superior Court had chastised a Suffolk County jury for returning a verdict of not guilty on May 17 in another rape trial over which he had presided. The article, headlined "Judge chastises jury for rape acquittal," described Judge McLaughlin's comments as "a scathing denunciation of the attitude of jurors toward rape victims." He was reported to have commented that "rape is going to continue until jurors by their verdicts convict and punish, when the evidence is overwhelming, as I think it was in this case . . . I wish I could say to you that you performed your jury service in the highest traditions of this commonwealth, and I can't." The article also stated that Judge McLaughlin ordered that the jurors be dismissed from any further service in the remaining ten days of the session.

The following Monday, May 20, petitioner's counsel introduced a copy of the *Globe* article and moved for a mistrial on the grounds that he had been deprived of his right to a fair trial. The trial judge, *sua sponte*, inquired of the 14 jurors in the case, individually, sequestering the interviewed

---

1. Both parties state in their proposed findings of fact that the article appeared on Saturday, May 18 and Sunday, May 19. The evidence in the record only supports a finding that it appeared in the Saturday paper.

from the uninterviewed jurors until the questioning was complete. The essence of his inquiry was as follows:

    a. Over the weekend, did you have occasion to read anything in the newspapers or hear anything on the radio or television about the remarks of the Chief Justice of this court with respect to a similar case which was heard last week?

    b. Have you discussed what you heard with any of your fellow jurors in this case?

    c. Would what you read or heard prevent you from making a fair and impartial decision in this case?

The trial judge refused the request of petitioner's counsel that he ask the jurors if they had heard of the remarks of the Chief Justice from other jurors in the jury pool or within the courthouse.

The inquiry showed that eleven of the fourteen jurors had knowledge of the article itself or of commentary regarding it. Of those eleven, ten stated that they were not influenced by the publicity and could make a fair and impartial judgment. One indicated that she could not remain impartial. She was excused from the jury. Upon return of the jury, no explanation or instruction regarding the publicity given the remarks of the Chief Justice was requested by the petitioner or given by the judge.

The judge's instructions to the jury included the following comments:

    We all read newspapers. We know the sort of things that are happening, unfortunately, in our community.

    .    .    .    .    .

    Now the actions of the court in ruling upon objections, any remarks that were made by the court to counsel, any questions that I might have put to the witnesses are not to be regarded by you as any indication as to how you decide the case, because what the verdict shall be is your decision and your decision alone.

Petitioner registered three objections to the judge's instructions, but none related to the publicity surrounding the remarks of the Chief Justice, or to the sections quoted above.

### II

Petitioner claims that he was deprived of a fair trial by the publicity accompanying the Chief Justice's remarks, and that the trial judge's denial of his motion for a mistrial constituted error of constitutional magnitude. He makes three arguments in support of his position: 1) that the publicity was prejudicial and that the trial judge failed to correct the prejudicial effects by curative instructions or by a proper voir dire; 2) that the judge's instructions compounded the prejudice arising from the article; and 3) that the jurors' statements that they could be impartial cannot be trusted in light of the nature of the publicity in this case.

Respondent argues that action on a motion for a mistrial is within the sound discretion of the trial judge, and that the publicity did not cause petitioner injury of constitutional magnitude.

### III

A threshold question is whether the publicity was in fact prejudicial. *United States v. Perrotta*, 553 F.2d 247 at 250 (1st Cir. 1977). Prejudicial publicity cases usually concern that which focuses specifically on the individual defendant. *See, e. g., Murphy v. Florida*, 421 U.S. 794, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975); *Sheppard v. Maxwell*, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); *United States v. Perrotta, supra*. Although allegations that publicity of a general nature constitute prejudice are more unusual, the First Circuit did recently consider such a situation in *United States v. Coast of Maine Lobster Co., Inc.*, 538 F.2d 899 (1st Cir. 1976). That case involved federal indictments for mail and wire fraud. The evidence closed on a Friday, after a week of testimony, and the case was to go to the jury on the following Monday. On Sunday, the United States Attorney for Maine, Peter Miller, while appearing on a local television broadcast, said

that he thought that white collar criminals did not go to jail often enough. On Monday morning the Portland Herald carried the headline: "MILLS: WHITE COLLAR CRIMINALS GET OFF EASY," along with a picture of Mills. Mills was not trying the case, but was a well-known public figure. After a motion for a mistrial was made, the trial judge asked the jurors as a group if they had read the article. One said he had read it, and seven or eight said they had seen the headline. They all said the publicity would not influence their judgment. The jury later returned guilty verdicts. On appeal the First Circuit reversed in the exercise of its supervisory powers, noting that no constitutional violation had occurred.

■ The court set forth in *Maine Lobster* the factors which it considers most important in evaluating the prejudicial nature of pre-trial publicity, namely

—the timing of the publicity;

—the relationship of the person making the statement to the criminal trial;

—the prominence of the public statement; and

—the relationship of the views published to the issues in the trial.

538 F.2d at 902.

Applying these standards to the instant case, it is apparent, first of all, that the timing was identical to that found in *Coast of Maine Lobster* to be "particularly critical" and strongly prejudicial. In both cases, the publicity occurred immediately prior to the beginning of jury deliberations. 538 F.2d at 902.

■ Secondly, comments by a judge are likely to be accorded great weight by jurors. *Quercia v. United States*, 289 U.S. 466, 470, 53 S.Ct. 698, 77 L.Ed. 1321 (1933); *Comm. v. McGrath*, 364 Mass. 243, 303 N.E.2d 108 (1973). Where prejudicial remarks come from the presiding trial judge error has been found. *Briggs v. United States*, 221 F.2d 636 (6th Cir. 1955). The court has found no case like this one in which the allegedly prejudicial remarks were made by another judge in an unrelated prosecution.

Third, the only evidence presented by petitioner to demonstrate the extensiveness of the publicity surrounding the Chief Justice's remarks is the *Globe* article. The article was printed on the front page of a Boston newspaper. Accordingly, the court finds that the publicity was extensive, and that eleven of the fourteen jurors had in fact been exposed to it.

Finally, the statement of the Chief Justice focused directly on the issues in petitioner's trial, and in particular, on the function of the jury.

Applying the *Maine Lobster* standards to the facts of this case, the publicity given the Chief Justice could be considered as having a potentially prejudicial impact on petitioner's trial. The critical issue is whether the trial judge acted so as to prevent any potential prejudicial impact on the trial.

## IV

■ The first obligation of a trial judge when advised that the jurors may have been exposed to prejudicial publicity is to conduct a voir dire to determine whether they were in fact exposed to and affected by the publicity. *United States v. Perrotta, supra*, at 250. In the exercise of its supervisory powers, the First Circuit set out in detail the proper course to be followed in this situation, following the procedure established in the Seventh Circuit:

[W]here prejudicial publicity is brought to the court's attention during a trial . . . the court must ascertain if any jurors who had been exposed to such publicity had read or heard the same. Such jurors who respond affirmatively must then be examined, individually and outside the presence of the other jurors, to determine the effect of the publicity. However, if no juror indicates, upon inquiry made to the jury collectively, that he has read or heard any of the publicity in question, the judge is not required to proceed further.

*United States v. Perrotta, supra,* at 250, citing *Margoles v. United States,* 407 F.2d 727, 735 (7th Cir.), *cert. den.,* 396 U.S. 833, 90 S.Ct. 89, 24 L.Ed.2d 84 (1969). There should be a two-step inquiry, the first to disclose the degree of exposure and then to determine the existence of prejudice. *United States v. Rhodes,* 556 F.2d 599 at 601 (1st Cir. 1977).

■ In the case at bar, the trial judge followed the procedure now required by the First Circuit. When he received information about the prejudicial publicity, he conducted a voir dire of the jurors individually, questioning them in a two-step process about their exposure to the publicity and whether it had any impact on their ability to be impartial. Since the procedure required by the First Circuit of its own judges under its supervisory powers may well be more stringent than would be constitutionally required, *United States v. Perrotta, supra,* at 249–250, n. 5, it is clear that the procedure followed by the trial judge satisfied constitutional requirements.

Petitioner also alleges that the instructions were constitutionally deficient. He argues, first, that a cautionary instruction should have been given, advising jurors not to be influenced by the remarks of the Chief Justice. Secondly, he argues that the trial judge's comment in his instructions that "we know the sort of things that are happening . . . in our community" had a negative impact.

■ During the trial, petitioner's counsel objected neither to the failure to give a cautionary instruction nor to the trial judge's comment recited above. Under such circumstances, failure to give an instruction rarely constitutes error of constitutional proportions. As the Supreme Court recently pointed out:

> An appraisal of the significance of an error in the instructions to the jury requires a comparison of the instructions which were actually given with those that should have been given. Orderly procedure requires that the respective adversaries' views as to how the jury should

be instructed be presented to the trial judge in time to enable him to deliver an accurate charge and to minimize the risk of committing reversible error. It is the rare case in which an improper instruction will justify reversal of a criminal conviction when no objection has been made in the trial court.

> The burden of demonstrating that an erroneous instruction was so prejudicial that it will support a collateral attack on the constitutional validity of a state court's judgment is even greater than the showing required to establish plain error on direct appeal. The question in such a collateral proceeding is "whether the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process," *Cupp v. Naughten,* 414 U.S. 141, 147, 94 S.Ct. 396, 38 L.Ed.2d 368, not merely whether " . . . the instruction is undesirable, erroneous, or even 'universally condemned,' " *id.,* at 146, 94 S.Ct., at 400.

> . . . An omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law.

*Henderson v. Kibbe,* 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977).

■ The court finds that neither the trial judge's comment about knowing "the sort of things that are happening unfortunately in our community" nor his failure to give a cautionary instruction after performing the voir dire "so infected the entire trial that the resulting conviction violate[d] due process." *Id.*

### V

■ The only remaining question is whether the publicity was so prejudicial that the court should find that the petitioner was deprived of his right to a fair trial, despite the assurances of the jurors that they could deliver a fair and impartial verdict. Such a finding is appropriate only where there is a "trial atmosphere that had been utterly corrupted by press coverage,"

*Dobbert v. Florida,* —— U.S. ——, ——, 97 S.Ct. 2290, 2302, 53 L.Ed.2d 344 (1977).[2]

■ There is no evidence of any such corrupting atmosphere in this case. The totality of circumstances demonstrates that petitioner had a fundamentally fair, if not perfect, trial. *Murphy v. Florida,* 421 U.S. 794, 799, 95 S.Ct. 2031, 44 L.Ed.2d 589 (1975). The alleged prejudicial publicity did not concern petitioner individually, but rather was of a general nature. The jurors were questioned separately and were consequently more likely to answer the judge's questions candidly. *United States v. Perrotta, supra* at 250. The response of one juror that she had been influenced by the report of the Chief Justice's comments suggests that the questions were in fact asked in a manner conducive to honest responses. Finally, no evidence has been presented that a prejudicial climate of opinion against the petitioner had been created in the community as a whole. *Cf. Sheppard v. Maxwell, supra; Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543, *reh. den.,* 382 U.S. 875, 86 S.Ct. 18, 15 L.Ed.2d 118 (1965); *Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961), where the questioning of the jury revealed a "pattern of deep and bitter prejudice"; *Shepherd v. Florida,* 341 U.S. 50, 71 S.Ct. 549, 95 L.Ed. 740 (1951) (Jackson, J., concurring).

## VI

The court holds accordingly that petitioner was not deprived of his constitutional right to a fair trial by publicity relating to the comments made by the Chief Justice.

2. In some situations, petitions for habeas corpus have been granted despite the statements of jurors that they could be impartial in the face of enormous prejudicial publicity. *See, e. g., Irvin v. Dowd,* 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961) where two thirds of the jurors in the venire had expressed an opinion prior to trial that the petitioner was guilty; *Sheppard v. Maxwell,* 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966) where the trial judge "did not fulfill his duty to protect Sheppard from the inherently prejudicial publicity which saturated the community and to control disruptive influences in the courtroom," 384 U.S. at 363, 86 S.Ct. at 1522. Compare *Beck v. Washington,* 369 U.S. 541, 82 S.Ct. 955, 8 L.Ed.2d 98 (1962); *reh. den.,* 370 U.S. 965, 82

The petition for a writ of habeas corpus is denied. An order will issue.

S.Ct. 1575, 8 L.Ed.2d 834 (1962), where the court rejected a petition for a writ of habeas corpus, stating

> We cannot say that the pre-trial publicity was so intensive and extensive or the examination of the entire panel revealed such prejudice that a court could not believe the answers of the jurors and would be compelled to find bias or pre-formed opinions as a matter of law.

369 U.S. at 557, 82 S.Ct. at 964. *See also,* ABA Project on Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press, 145–7, Commentary to § 3.5(f), stating that whether a juror's assurances of impartiality should be accepted depends on the extent of the pre-trial publicity.