STATE

v.

**Joyce Ann NORTHUP.**

**No. 83–608–C.A.**

Supreme Court of Rhode Island.

Jan. 8, 1985.

Reargument Denied Feb. 13, 1985.

Dennis J. Roberts II, Atty. Gen., Thomas M. Dickinson, Sp. Asst. Atty. Gen., for plaintiff.

William F. Reilly, Public Defender, Barbara Hurst, Janice M. Weisfeld, Asst. Public Defenders, Chief, Appellate Div., for defendant.

## OPINION

SHEA, Justice.

In May 1983, the defendant, Joyce Ann Northup, was tried before a jury in the Superior Court on a five-count indictment. The jury found her guilty of driving so as to endanger, resulting in death, in violation of G.L. 1956 (1982 Reenactment) § 31–27–1; leaving the scene of an accident after personal injury, in violation of § 31–26–1 (two counts); and attempting to elude a traffic officer, in violation of § 31–27–4. The jury found the defendant not guilty on the remaining count of driving under the influence of alcohol in violation of § 31–27–2. We affirm the judgments of conviction.

On appeal, defendant assigns as errors certain instructions to the jury on the reckless-driving charge, the denial of her motion to pass the case based on improper publicity, and the denial of her motion to sever the charge of driving under the influence of alcohol or, alternatively, to hold a pretrial evidentiary hearing.

The tragic event that culminated in defendant's conviction occurred in the early morning hours of May 9, 1982. What follows is defendant's version of what happened. Earlier in the evening, she and a girlfriend had gone to a nightclub in Providence where defendant said she had consumed two and one-half beers. While there she saw her boyfriend with another woman and became emotionally upset. Sometime later, she drove her girlfriend home. She said that she cried for a time while she talked with her friend but that she had regained her composure by the time they parted company which was shortly after 1:30 a.m. Her route home took her along Reservoir Avenue, a four-lane highway in the city of Cranston. She traveled in a southerly direction along Reservoir Avenue in the right-hand lane. The weather was clear, the highway was well lit, and the traffic at that time was light. As she approached the vicinity of the International House of Pancakes, she observed two people standing in the parking or breakdown lane to her right beside a parked automo-

bile. Her speed was forty miles per hour. At that time, it became necessary for her to get a Kleenex out of her pocketbook on the front seat beside her. The next thing she recalled was hearing her windshield break on the right side and seeing a man bent over between her car and the parked automobile. She slowed her vehicle, looked into her rearview mirror, saw nothing, and continued on along Reservoir Avenue toward her home. When asked on direct examination why she had not stopped, defendant said, "I panicked, and I was scared." She further testified: "I couldn't believe I hit a person. I saw him, but I couldn't believe I hit one, and I was scared to death. I wasn't sure what just happened, and I just wanted to get home."

At trial, officer Gaulin of the Cranston police testified that on the evening in question, he and a fellow officer had been operating a radar unit a short distance south of the pancake house. He heard what sounded like a bang or a loud thud north of their location and clocked a vehicle passing their station with the windshield smashed on the passenger side. The vehicle, which was clocked at forty miles per hour in a posted forty-five-mile-per hour zone, was the only vehicle traveling south at that time. Suspecting that an accident had occurred, the officers gave emergency pursuit and after two turns off Reservoir Avenue, the vehicle came to a stop. At some point during the pursuit, the vehicle's headlights were turned off. The defendant was identified and questioned about the broken windshield. She responded that she thought someone had thrown a rock at her windshield, pointing in the direction of Reservoir Avenue. Officer Gaulin stated that he observed blood and what he believed to be human substance in the area of the right directional light and windshield. The defendant was asked to step out of her vehicle. The officer testified that she was unsteady, her speech was slightly slurred, and a slight odor of alcohol was detected on her breath. Within minutes the officers received information that two persons were lying in the road in the vicinity of the pancake house. The defendant was notified of her rights and transported to the Cranston police station. One of the victims, Louis Petrucci, died of the injuries he suffered. The other victim, Kathleen Peterson, was seriously injured and remains paralyzed.

I

The first assignment of error is to the trial justice's instruction that the jury was not to consider the behavior of the victims in determining whether defendant's conduct was reckless within the meaning of the statute. More specifically, defendant claims that the trial justice erred when he said: "Even if you did think that this accident was caused because of the carelessness of [the victims] in standing where they did, that has nothing to do with this case."

The defendant bases her challenge on the unsupported theory that the victims themselves may have caused this accident by stepping out of the parking lane into defendant's path of travel. There was absolutely no evidence that would fairly support such a finding. The defendant testified that she had seen the victims standing in the parking lane and that she did not see them step out into the road. A witness for the state testified that he saw the victims standing in the parking lane and that they remained in that area during the course of his observation. The surviving victim, Miss Peterson, testified at trial that she was standing beside Mr. Petrucci at her car close enough to unlock the door. Beyond that point, Miss Peterson has no recollection of the accident. Nevertheless, defendant suggests on appeal that the trial justice should have instructed the jury that it must consider where the victims were standing when they were struck when determining whether defendant drove her vehicle recklessly. We cannot agree. In the past, we have said that even in situations in which the evidence supported such an instruction, at most it would go to establish

contributory negligence on the part of the victims, and contributory negligence, we have said, is not a defense to a charge of vehicular homicide that is a proximate result of the reckless operation of a motor vehicle. *State v. San Antonio*, 97 R.I. 48, 195 A.2d 538 (1963). The defendant acknowledges the applicable law but relies on our more recent decision in *State v. Dionne*, R.I., 442 A.2d 876 (1982), and decisions from other jurisdictions, for the proposition that a jury *must* first take into account the conduct of both the driver and the decedent in determining whether defendant was reckless. We agree with defendant that *Dionne* is controlling here, but we do not agree with defendant's interpretation of that case. The defendant notes correctly that in *Dionne*, this court said:

> "[I]n determining whether the defendant's conduct is reckless within the meaning of the statute, the jury may consider the entire situation, including the conduct of the decedent *if it had a bearing on the defendant's conduct.* The jury may also take into account all the circumstances, including the decedent's conduct *if relevant,* when determining if the unlawful conduct of the accused was a proximate cause of the death." (Emphasis added.) *Id.* 442 A.2d at 886–87.

This language, however, was never intended to require that the jury first consider the conduct of both parties in determining defendant's guilt. We also said in that case that

> "[b]efore the trial justice is obligated to charge the jury regarding the consideration that may be given to the deceased's conduct * * *, *evidence must have been introduced which would indicate that the deceased's conduct was the sole cause of her death and that the defendant's conduct had nothing to do with the fatality.*" (Emphasis added.) *Id.* 442 A.2d at 887.

What this language suggests is a two-part analysis. First, the jury must determine whether defendant was reckless within the meaning of the statute, taking into consideration such factors as the time, place, presence of other people, and circumstances of the situation, *State v. Lunt*, 106 R.I. 379, 260 A.2d 149 (1969), and whether such recklessness was the sole proximate cause of the victim's death. If it was not, the jury may consider whether the victim's conduct was the sole proximate cause of her death and that defendant's conduct was not a proximate cause of the fatality. *See State v. Watkins*, R.I., 448 A.2d 1260 (1982). This second part of the analysis is reached only when there is evidence introduced that the victim was in fact negligent. There was no such evidence in this case. Here, defendant testified that she saw the victims standing in the parking lane and she did not see them step out into her lane of travel. She further admitted that she did not slow down when she saw the victims or make any attempt to move over into the left-hand lane despite the fact that it was free of any traffic at the time. This testimony was corroborated by the state's witness. The defendant further stated that she diverted her attention from the road to reach into her pocketbook for a Kleenex at a time when she knew the victims were in the vicinity. Reckless driving, we have said, means operating a vehicle in such a manner as to indicate either a willful or a wanton disregard for the safety of persons or property. *State v. Scofield*, 87 R.I. 78, 138 A.2d 415 (1958). Under the circumstances of this case, there was ample evidence for the jury to conclude that defendant was reckless in the operation of her vehicle and that her recklessness was the sole proximate cause of the fatality. Therefore, the trial justice did not err in instructing the jury not to consider the victims' conduct in determining whether defendant's conduct was a proximate cause of the death.

## II

The defendant next claims that the trial justice erred in denying her motion to pass based on improper publicity. The de-

fendant's claim of error stems from a newspaper article of an interview with the trial justice who presided at her trial. The article appeared on page 1 of the Providence Sunday Journal on May 15, 1983, during the course of the trial. The interview was precipitated by the trial justice's imminent retirement after almost twenty-five years of service on the Superior Court bench. The title of the article was "A Judge Has His Say on Justice in R.I." At the time he moved to pass the case, defendant's trial counsel said: "I am troubled by certain of the remarks that were made and printed and by the appropriateness of the timing of the publication of this article. * * I think that the timing * * * is prejudicial to my client and makes it difficult for her to get a fair trial." Particular reference was made by counsel to the judge's reported comments on the naivete of jurors, the difficulty they encounter in evaluating the credibility of defense witnesses, and the tactics that some defense attorneys employ.

It is beyond question that the timing of the release of this story could not have been less fortunate from defendant's point of view. The contents of the article containing the thoughts of the trial justice before whom she was defending herself against very serious charges created problems not only for defendant but for the judicial process itself. No one, not even defendant, has questioned the right of the newspaper to publish the article when it did. However, it seems obvious that the readership of the newspaper and the First Amendment guarantee of a free press would be unhampered and preserved by a publication of this article after this respected trial justice had completed his active participation in criminal trials.

Nevertheless, our review is limited to the question of whether defendant's constitutional right to a fair trial was actually prejudiced. *State v. Cline*, 122 R.I. 297, 405 A.2d 1192 (1979); *Palmigiano v. State*, 120 R.I. 402, 387 A.2d 1382 (1978). The record reveals that the trial justice interrupted the trial and conducted a voir dire of the individual jurors in his chambers in the presence of defendant, her attorney, and the prosecutor. This was done to determine if any of the jurors had read the article and, if so, whether it had any effect on their ability to be fair and impartial in their deliberations. All but three of the fourteen jurors and alternates had read the article. All who had read it, when questioned, said that the article would have no effect upon their ability to judge the case on the evidence and the law. The trial justice then denied defendant's motion to pass the case.

The thrust of defendant's assertions, as we understand the situation, is that in reacting to the trial judge's impressions, the jurors in this case might have been encouraged to ignore the testimony of defendant and return a verdict of guilty notwithstanding the evidence. This argument is defeated, in our opinion, by the fact that defendant was acquitted on the count of driving under the influence of alcohol notwithstanding the evidence presented on that charge. We can conclude therefrom that the jurors' protestations that the article would not affect their deliberations were correct.

The defendant directs our attention to *United States v. Coast of Maine Lobster Co.*, 538 F.2d 899 (1st Cir.1976). In that case, the defendants were on trial for mail fraud. On the day before the case was to go to the jury, the prosecutor's immediate supervisor, who was known as such to the jury, appeared on a television news broadcast and expressed his opinion about people who commit so-called white-collar crimes. He intimated that the District Court judge was excessively lenient in sentencing this particular class of criminal defendants. The day following the taped interview, the local newspaper prominently published his comments on the front page. At the time of the release, the prosecution of the defendants was the only federal criminal proceeding taking place in the district. Although the article made no reference to the

defendants or to the pending trial, the Court of Appeals, recognizing the potential for prejudice, exercised its supervisory power, vacated the conviction, and ordered a new trial on the grounds of prosecutorial impropriety.

What principally distinguishes *Coast of Maine Lobster Co.* from this case is that *Coast of Maine* did not involve an accused's constitutional right to a fair trial. The Appeals Court said:

> "We do not hold that the article, in spite of its timing, was sufficiently prejudicial to cause the trial to be constitutionally unfair. There was no certainty, perhaps no more than a possibility, that the jury would be affected. We realize that our opinion may be construed by prosecutors as chilling their own freedom of speech and by defense counsel as a hunting license to seek out any published statements, present or past, of anyone associated, however indirectly, with the prosecution of his client. It therefore behooves us to emphasize the narrowness of the rule we announce today and clearly to state the conditions under which we will exercise our supervisory power and set aside a conviction in a case similar to the one at bar." 538 F.2d at 902.

The court then set out a four-factor test to facilitate its supervisory power over prosecutors' statements in the future. The elements of the test include: "the timing of the statement, the relationship of the prosecutor to the criminal trial, the prominence of the public statement, and the relationship of the published views to the issues in the prosecution." *Id.*

The *Coast of Maine* case is clearly distinguishable from the case before us. In this case, the specific issue raised is one of constitutional unfairness, not one of judicial impropriety. We do, however, recognize that the criteria set forth in that case for determining whether prejudice has occurred serve as a useful guide for trial justices confronted with this question.

We have read the article at issue in this case very carefully. Apart from the fact that the trial justice was the subject of the article, we find no link between the judge's remarks and the trial of this defendant. Rather, the newspaper article summarized the judge's general observations and impressions during his long tenure on the bench. These general observations had to do with jurors, defense witnesses, prosecutors, public defenders, police, parole and bail, repeat offenders, and judges. We enumerate these subjects to demonstrate that no one particular group or groups in the judicial system were singled out for comment. We fail to find any demonstrable evidence of prejudice.

### III

The defendant's final assignment of error deals with the trial justice's denial of her motion to sever for separate trial the charge of driving under the influence of alcohol in violation of § 31-27-2.

Generally, the "denial of a motion for a severance will not be reversed unless it is affirmatively shown that the defendant did, in fact, suffer prejudice sufficiently substantial to impinge upon his right to a fair trial." *State v. Sharbuno*, 120 R.I. 714, 717, 390 A.2d 915, 917 (1978); *State v. Patriarca*, 112 R.I. 14, 28, 308 A.2d 300, 310 (1973). Furthermore, severance is not a matter of right but is directed to the sound discretion of the trial justice. *State v. Whitman*, R.I., 431 A.2d 1229 (1981).

It is defendant's contention that but for the erroneous admission of evidence of drinking, she would have been acquitted on the reckless-driving charge. There is no merit to this argument. In *State v. Amaral*, 109 R.I. 379, 285 A.2d 783 (1972), a case both parties agree is dispositive of this issue, this court held that "proof of intoxication is relevant for the jury to consider in determining whether defendant was operating his vehicle in reckless disregard of the safety of others * * *." *Id.* at 387, 285 A.2d at 787. Consequently, even if the trial justice had ordered a severance, the

evidence of intoxication would still have reached the jury on the charge of driving so as to endanger resulting in death. Thus, defendant would have gained nothing from a severance.

 The defendant also argues that under *Amaral* the trial justice was compelled to conduct a pretrial hearing on the issue of intoxication and that his refusal to do so caused her substantial prejudice. We disagree. In *Amaral*, intoxication was not an issue. The defendant was before the court solely on a charge of driving to endanger, death resulting. The court held that in those circumstances, the admission of extraneous evidence of intoxication was prejudicial. The court said:

"Fairness demands that criminal trials be free of unduly prejudicial matter and of matter which has a direct tendency of creating confusion in the minds of the jurors by introducing another issue, namely, whether defendant was intoxicated, when intoxication is not an issue in the case." *Id.* at 386, 285 A.2d at 787.

Here, the question of driving under the influence was a separate and distinct offense for jury determination and on this record we hold that the trial justice did not abuse his discretion in refusing to conduct a pretrial hearing or in denying the defendant's motion to sever.

For the reasons stated, the defendant's appeal is denied and dismissed, the judgments of conviction appealed from are affirmed, and the papers in the case are remanded to the Superior Court.