**UNITED STATES of America, Appellee,**

v.

**William P. McNEILL, Defendant, Appellant.**

**No. 83–1324.**

United States Court of Appeals,
First Circuit.

Argued Dec. 6, 1983.

Decided Feb. 13, 1984.

**6**

Morris M. Goldings, Boston, Mass., with whom Richard S. Jacobs, and Mahoney, Hawkes & Goldings, Boston, Mass., were on brief, for defendant, appellant.

Robert J. Cordy, Asst. U.S. Atty., Boston, Mass., with whom William F. Weld, U.S. Atty., Boston, Mass., was on brief, for appellee.

Before COFFIN and BREYER, Circuit Judges, and MALETZ,* Senior Judge.

* Of the United States Court of International Trade, sitting by designation.

COFFIN, Circuit Judge.

William P. McNeill appeals a jury conviction on ten counts of mail fraud, 18 U.S.C. § 1341. The jury convicted McNeill, the former acting budget director for the City of Boston, for uses of the mails that furthered his (temporarily successful) attempt to defraud the State-Boston Retirement System of accidental disability pension benefits.

The prosecution was based on McNeill's filing an application for a pension, claiming permanent back injury from a fall four years earlier, in 1977, on an "icy corridor" in Boston City Hall. On the strength of a backdated injury report, which listed as witnesses three friends who had not seen his fall, and an examination by a three-doctor panel, the State-Boston Retirement Board had awarded an annual pension of some $37,000. The evidence at trial revealed that McNeill had not told his treating physicians that he had had a fall but rather that his back problem had begun in 1976 and had been aggravated by playing golf and bending over to put on his socks. The insurance forms similarly made no mention of an accident, and McNeill's trial testimony was in conflict with his own backdated injury report.

McNeill seeks reversal on grounds of pretrial publicity generated by the indictment of another city budget department official on similar but unrelated charges on Thursday, March 24, 1983. McNeill's trial began the following Monday, March 28, 1983. McNeill also presents other less substantial challenges to his conviction.

When a federal grand jury in Boston indicted McNeill on December 14, 1982, the indictment received front-page coverage in Boston newspapers. Following arraignment and pre-trial motions, the district court judge on February 28, 1983, set a trial date of March 28, 1983.

Meanwhile, in late 1982 and early 1983, the United States Attorney's office for the District of Massachusetts had been investigating similar charges against Maurizio P. Rendini, who, like McNeill, had worked for the budget department of the City of Boston before filing for accidental disability benefits. Only on March 17, 1983, was the government able to obtain the grand jury testimony in the Rendini case of an important, though recalcitrant witness who had not honored earlier subpoenas to appear before the grand jury. The United States Attorney then met with the Deputy United States Attorney and head of the Public Corruption Unit, Mark L. Wolf, and the Assistant United States Attorneys responsible for the McNeill and Rendini cases, to discuss whether to delay the Rendini indictment in light of the imminence of the McNeill trial. After concluding that a publicly announced indictment of Rendini would not prejudice McNeill's right to a fair trial by an impartial jury, the United States Attorney, through an Assistant United States Attorney, presented the Rendini indictment to the grand jury on Thursday, March 24.[1] The grand jury indicted Rendini the same day.

The United States Attorney's office released the indictment along with a standard press release that gave Rendini's name, address, age, previous occupation, a summary of allegations contained in the indictment, the maximum sentence on each of the 21 counts of mail fraud, and the names of the responsible Assistant United States Attorneys. The press release also stated that the Rendini indictment was the result of a continuing investigation by the United States Postal Service. The United States Attorney's office disseminated the press release in the usual manner, making it available in the press room at the federal courthouse and at the Massachusetts State House.[2]

1. Assistant United States Attorney Robert J. Cordy, who prosecuted McNeill and who was present at the meeting at which the timing of the Rendini indictment was discussed, stated at oral argument in this appeal that the Rendini grand jury sat only on Thursdays. Therefore, March 24, the date of the indictment, was the first grand jury day after March 17, the date on which the previously unavailable government witness had testified.

2. Deputy United States Attorney Wolf told the trial court in a side-bar discussion during an evidentiary hearing on the timing of the Rendi-

The next day, Friday, March 25—three days before the start of McNeill's trial—the Boston newspapers gave prominent coverage to the Rendini indictment. Both the Boston Globe and the Boston Herald printed first-page headlines referring to a former municipal official or pensioner in terms that could have been misconstrued as applying to the McNeill case.[3] Both newspapers provided essentially straightforward accounts of the Rendini indictment, and both articles mentioned briefly that McNeill would go on trial the following Monday on similar charges.[4]

The extent of local broadcast media coverage of the Rendini indictment is unclear. The defendant filed one affidavit, which stated that one of the local television news channels had reported the Rendini indictment Thursday evening and had included in the coverage film footage of McNeill walking with his attorney in the courthouse corridor. According to the affidavit, the news reporter stated that McNeill had been indicted on the same charges in December and that his trial would begin the following week. Defendant presented no further evidence concerning broadcast media coverage of the Rendini indictment.

On the first day of trial, Monday, March 28, 1983, McNeill moved to dismiss the indictment on the grounds that prosecutorial misconduct had "engender[ed] massive pretrial publicity so as to place at grave risk" his right to a fair trial before an impartial jury. The court granted defendant an evidentiary hearing, at which defendant called Deputy United States Attorney Wolf. In a side bar discussion, Wolf explained the decision to proceed with the Rendini indictment. Having heard Wolf's testimony and

examined defendant's exhibits, the district court denied defendant's motion to dismiss, finding that it would "be possible to select a fair and impartial jury in this case".

During the voir dire of prospective jurors, the district court asked, in addition to the usual questions, four additional questions, all proposed by the defendant, relating to pre-trial publicity. Of the fifty-one prospective jurors called in this case, the court excused eleven for cause, and only five of these eleven indicated that they had read or heard recent publicity concerning the McNeill case. Of the twelve actual jurors, three had not responded affirmatively to any of the voir dire questions. Five stated that they had not read or heard anything concerning the McNeill case. The remaining four jurors recalled varying amounts of publicity.

Defendant did not challenge for cause any of the actual jurors or alternates. The court denied only two of defendant's twelve challenges for cause. Defendant peremptorily challenged those two prospective jurors and used his other eight peremptory challenges to remove from the jury persons whom defendant had not challenged for cause.

Following a seven-day trial, the jury found McNeill guilty.

## I. Pre-Trial Publicity

McNeill presses a number of related grounds for reversal based on the publicity engendered by the Rendini indictment. McNeill alleges that the publicity was so massive as to create a presumption of prejudice, that actual prejudice can be inferred from answers given by prospective jurors during voir dire, and finally, that the deliberate engendering of this publicity consti-

---

ni indictment: "[W]e normally make [press releases] available in the press room here and, I think, at the State House." Defendant McNeill has not pointed to anything in the record to contradict this statement.

3. The Herald headline read, "EX–WHITE AIDE ON $24G CON RAP". Boston Herald, Fri., March 25, 1983, at 1. (Kevin White was then Mayor of Boston). The inside headline read, "Budget big 'faked injury for pension.'" Id. at 3, col. 2. The Globe contained a one-column

headline: "Pensioner indicted in fraud case". Boston Globe, Fri., March 25, 1983, at 1, col. 1.

4. The Boston Herald mistakenly reported that McNeill would stand trial "on similar but related [sic] charges of mail fraud in connection with obtaining a fraudulent $36,000 disability pension". Boston Herald, Fri., March 25, 1983, at 3, col. 3. Despite their similarities, the McNeill and Rendini cases were in fact unrelated.

tuted prosecutorial misconduct in light of standards established by this court in *United States v. Coast of Maine Lobster Co.,* 538 F.2d 899 (1st Cir.1976). We do not agree with any of defendant's contentions.

### A. Presumed Prejudice From "Massive Publicity"

■ A court may properly presume prejudice only where "prejudicial, inflammatory publicity about [a] case so saturated the community from which [the defendant's] jury was drawn as to render it virtually impossible to obtain an impartial jury". *United States v. Chagra,* 669 F.2d 241, 250 (5th Cir.) (citations omitted), *cert. denied,* 459 U.S. 846, 103 S.Ct. 102, 74 L.Ed.2d 92 (1982); *see, e.g., United States v. Haldeman,* 559 F.2d 31, 59–64 (D.C.Cir.1976) (no presumed prejudice created by Watergate publicity), *cert. denied,* 431 U.S. 933, 97 S.Ct. 2641, 53 L.Ed.2d 250 (1977).

■ The straightforward news accounts of the Rendini indictment carried in the Boston newspapers, *supra* at 8 n. 3, *cf. Beck v. Washington,* 369 U.S. 541, 556, 82 S.Ct. 955, 963, 8 L.Ed.2d 98 (1962) (distinguishing straight news stories from inflammatory articles), and the elliptical evidence of broadcast media coverage do not even approach the evidentiary showing required, in terms of depth, breadth, style, or duration of coverage, for a court to presume that an unbiased jury could not be selected at that time and place. Even setting aside for a moment the significant fact that the Friday newspaper articles focused on another person (albeit one in a similar predicament), the contents of those articles would not have the inevitable result of convincing prospective jurors that McNeill was guilty as charged. *See, e.g., United States v. Blanton,* 719 F.2d 815, 818, 831–33 (6th Cir. 1983) (en banc) (former Tennessee governor received fair trial despite 240 adverse articles in local newspapers), *petition for certiorari filed,* 52 U.S.L.W. 3462 (U.S. Nov. 23,

1983); *see also* 719 F.2d at 835–36 (Engel, J., dissenting) (detailing adverse pretrial publicity).

### B. Actual Prejudice: The Voir Dire Answers

Defendant has also attempted to show actual juror prejudice attributable to the publicity surrounding the Rendini indictment. Defendant's briefing of this issue consists mostly of ten pages of excerpts from the voir dire transcript. Defendant argues that the voir dire answers demonstrate that jurors and prospective jurors had prejudged McNeill's guilt and had confused McNeill with Rendini and other persons accused of disability pension fraud.

■ We begin our analysis from the well-established premise that a juror need not be totally ignorant of the facts and issues involved in a case.

> " 'To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court.' " *Murphy v. Florida,* 421 U.S. 794, 800, 95 S.Ct. 2031, 2036, 44 L.Ed.2d 589 (1975) (quoting *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961)).

If the trial judge, who conducted the voir dire and who could develop a contemporaneous impression of the extent and intensity of community sentiment regarding the defendant, believed that he had impanelled a jury of twelve open-minded, impartial persons, then we will set aside his action only where juror prejudice is manifest. *See Irvin v. Dowd,* 366 U.S. at 723–24, 81 S.Ct. at 1642–43; *United States v. Blanton,* 719 F.2d at 829–30.[5]

---

**5.** In the exercise of our supervisory powers over the federal district courts, we may make a finding of juror bias on a lesser showing of prejudice than would be required under the constitutional standard applicable to state courts. *See Murphy v. Florida,* 421 U.S. at 797–803, 95 S.Ct. at 2034–2037; *Marshall v.*

In *United States v. Gullion*, 575 F.2d 26, 29 (1st Cir.1978), we stated that a defendant must show "clear abuse" to overturn a trial court's denial of a challenge for cause against a juror. Defendant must carry an even heavier burden where, as here, defendant did not challenge a single seated juror for cause. We have held that a defendant who fails to challenge a juror during voir dire waives that challenge, absent clear injustice. *United States v. Cepeda Penes*, 577 F.2d 754, 759 (1st Cir.1978); *see also United States v. Provenzano*, 620 F.2d 985, 996 n. 15 (3d Cir.), *cert. denied*, 449 U.S. 899, 101 S.Ct. 267, 66 L.Ed.2d 129 (1980); *United States v. Renfro*, 620 F.2d 569, 577 (6th Cir.), *cert. denied*, 449 U.S. 902, 101 S.Ct. 274, 66 L.Ed.2d 133 (1980).

In our review of the voir dire proceedings, we find no clear admission of prejudice in the responses of persons actually impanelled on the jury. Nor do we infer from the responses of other prospective jurors and from attendant circumstances any reason to doubt the veracity of the jurors' avowals of impartiality. Although a court need not defer to a juror's assurance of impartiality, *see Murphy v. Florida*, 421 U.S. at 800, 95 S.Ct. at 2036, to reach a contrary conclusion a court must rely on some evidence of pervasive, overpowering animus against defendant. This record does not contain such evidence.

Four jurors responded affirmatively to the court's inquiries concerning exposure to pretrial publicity. Juror Woluschuk stated that he worked in the Globe composing room, regularly perused the newspaper, and believed that the Globe's investigation of accidental disability pension fraud "seems to have snowballed". He stated nonetheless that he had not formed any opinion and could put aside what he had heard and decide the case on the basis of evidence received in court. Defendant did not challenge Mr. Woluschuk for cause. Juror Deegan had heard a brief news item on the radio that morning, but said that he had formed no opinion about the case. Defendant did not challenge Mr. Deegan for cause.

Juror Zafron did express, in a fumbling way, some "reservations" about his ability to decide only on the basis of the evidence. But after Zafron replied to defense counsel's query by saying that he had just "glanced over the article", defendant did not move to dismiss Zafron for cause.

Juror Holland displayed some familiarity with the case, in part because of his responsibility for pension and retirement matters as assistant superintendent of schools in Malden, Massachusetts. He indicated that he had formed no opinion and could decide the case solely on the basis of the evidence. Again, no challenge from defendant.

Although the trial judge may well have excused at least Mr. Zafron for cause had defendant challenged Mr. Zafron, defendant did not do so. The presence of these jurors on the panel clearly did not cause manifest injustice to defendant.

C. Prosecutorial Misconduct in Deliberately Engendering Publicity

Defendant next asserts that the United States Attorney transgressed this court's holding in *Coast of Maine Lobster*, in which we reversed a conviction because of publicized statements made by a United States Attorney during a criminal trial conducted by his office. Defendant further supports his claim of prosecutorial misconduct by citing the professional standards embodied in various federal and state rules and regulations.

*Coast of Maine Lobster* involved statements of opinion made by the United States Attorney for the District of Maine during the ongoing trial of defendants charged with multiple counts of mail and wire fraud involving false promises to ship Maine lobsters nationwide. On a taped television interview program, the United States Attorney expressed his personal view that "white collar" criminals were treated leniently at sentencing by the sole sitting district judge in the District of Maine. The following morning, the Portland Press Herald, the

*United States,* 360 U.S. 310, 313, 79 S.Ct. 1171, 1173, 3 L.Ed.2d 1250 (1959) (per curiam).

widely read local newspaper, gave front-page coverage to the United States Attorney's statements.

When court convened that morning, defendant moved for a mistrial. The court asked the jurors about their exposure to either the televised interview or the newspaper account of the interview. A few jurors acknowledged having seen the front page of the newspaper, which contained a picture of the United States Attorney. The jurors did not respond when the court asked them if anyone had read the article or if seeing the picture or anything else would influence them. Defendant was convicted.

On appeal, we exercised our supervisory powers and reversed the conviction. In so doing, we "emphasize[d] the narrowness of the rule [announced that day] and clearly [stated] the conditions under which we will exercise our supervisory power and set aside a conviction in a case similar to the one at bar". 538 F.2d at 902. We then set out the applicable test:

> "The following factors are critical: the timing of the statement, the relationship of the prosecutor to the criminal trial, the prominence of the public statement, and the relationship of the published views to the issues in the prosecution." *Id.*

For the following reasons, we find that *Coast of Maine Lobster* and the instant case present distinguishable circumstances that require opposite results.

First, the prosecutor in *Coast of Maine Lobster* made his statement *during trial,* after a jury had been impanelled. The newspaper account of his views was published the morning of the day in which the jury began its deliberations, and the trial judge asked the jury as a group whether any of them had been affected by the publicity. In the instant case, by contrast, media coverage of the Rendini indictment occurred prior to trial, and the trial judge conducted a thorough, individual voir dire of those prospective jurors who admitted exposure to the pre-trial publicity.

Second, the United States Attorney in *Coast of Maine Lobster* volunteered his opinion on the sole sitting federal judge's leniency on white collar criminals. While such statements may have been permissible under other circumstances, those statements were not made in the ordinary course of a prosecutor's business and did not serve usual governmental purposes. In the present case, however, the Rendini indictment was routine and was accompanied by a standard press release that apparently received normal distribution. The Rendini press release did not mention McNeill or the imminency of his trial. As we stated in response to the government's petition for rehearing in *Coast of Maine Lobster,* "There is a vast difference between a United States Attorney's 'keeping the public informed on the general administration of federal criminal justice in his district', and telling a jury that a particular judge before whom it is sitting imposes inadequate sentences in the type of case they are hearing". 538 F.2d at 904 (per curiam).

Although the government controlled the timing of the Rendini indictment and could have delayed or sealed the Rendini indictment for the estimated week or two that the United States Attorney expected the McNeill trial to last, such a departure from routine would have conflicted with the United States Attorney's duty to prosecute cases promptly and to inform the public, in a manner consistent with constitutional and regulatory norms, of the institution of criminal cases. The public interest in prompt and publicly announced prosecution is perhaps strongest in a case such as Rendini's involving charges that a public official abused his position for personal gain.

Third, the nexus between the allegedly prejudicial publicity and defendant's fair trial rights is weaker in this case than in *Coast of Maine Lobster,* where we stated that "the nexus between the views as published and the issues in the pending trial must be close enough so that reasonable person might see an obvious connection. If the ... nexus [is] remote or strained, the potential for prejudice is not realistic". *Id.* at 902. The allegedly prejudicial publicity in this case focused on another person: Rendini. This fact itself places great strain

on defendant's allegation of prejudice, notwithstanding the similarities between McNeill's and Rendini's official positions and fraudulent schemes.

Moreover, the number of federal prosecutions, especially for narcotics and corruption offenses, in the District of Massachusetts would render impracticable any rule that discouraged the United States Attorney for the District of Massachusetts from proceeding in the ordinary course with an indictment that would create publicity that might prejudice a defendant in some other pending prosecution within the district. The nexus between a prosecutor's statements— be they statements of opinion as in *Coast of Maine Lobster* or statements of fact as here—and an ongoing prosecution tends to be closer the smaller the district.

We find no merit in defendant's related argument that the Rendini indictment and press release violated professional standards of conduct, federal regulations on disclosure of information by federal prosecutors, and the local rules of the district court. Rule 3:07, DR 7–107(C) of the Rules of the Massachusetts Supreme Judicial Court and Rule 35 of the Local Rules of the United States District Court for the District of Massachusetts specifically allow a lawyer in the pretrial phase of a criminal matter to announce, *inter alia,* the name, address, age, residence, occupation and family status of the accused; the identity of investigating agencies and the length of the investigation; the nature, substance, or text of the charge; and references to public records of the court in the case. The Rendini indictment fully complied with DR 7–107(C) and Local Rule 35.

Defendant also cites Department of Justice regulations, 28 C.F.R. § 50.2, that contain guidelines for release of information by Department of Justice employees (including United States Attorneys and their assistants). Defendant quotes 28 C.F.R. § 50.-2(b)(5), which states:

"Because of the particular danger of prejudice resulting from statements in the period approaching and during trial, they ought strenuously to be avoided during the period. Any such statement or release shall be made only on the infrequent occasion when circumstances absolutely demand a disclosure of information and shall include only information which is clearly not prejudicial."

Defendant neglected to quote a prior portion of the same regulation that explicitly permits public disclosure of the type of information contained in the Rendini press release. *See* 28 C.F.R. § 50.2(b)(3). Subsection (b)(3) permits personnel of the Department of Justice to make public defendant's name, age, residence, and "similar background information"; the substance or text of the charge, such as an indictment; and the identity of the investigating agency and the length or scope of the investigation. The Rendini indictment clearly complied with this Justice Department regulation.

## II. Refusal to Exclude Testimony

McNeill contends that the district court erred in overruling McNeill's objections to the admission of testimony both that McNeill made a false statement about his address to the Retirement Board at his hearing [6] and that McNeill had obtained several (legal) loans from the City Credit Union, of which both McNeill and the Retirement Board Chairman, Thomas Gately, were directors. We hold that the district court did not abuse its discretion in refusing to exclude these items of testimony.

 The furnishing of a false address to the Retirement Board provides probative evidence of McNeill's scheme, *see United States v. D'Alora,* 585 F.2d 16, 20 (1st Cir. 1978) (evidence of other acts admissible as "to complete the story of the crime on trial"), and of his intent to defraud the Board, *see United States v. Foshee,* 578 F.2d 629, 632–33 (5th Cir.1978) (per curiam)

---

6. At the hearing, McNeill said that his address had "always been" 10 Burton Street, Brighton, Massachusetts, but on every document before

the Retirement Board McNeill had listed his address as 54 Deerfield Road, Needham, Massachusetts.

(on petition for rehearing) (explaining liberal policy for admission of evidence to prove specific intent to defraud); *United States v. Brandt,* 196 F.2d 653, 657 (2d Cir.1952) (jury should hear all but the most prejudicial testimony relevant to intent in cases alleging mail fraud, a specific intent offense). The evidence is thus admissible under Rule 404(b) of the Federal Rules of Evidence unless its prejudicial effect substantially outweighs its probative value. Fed.R.Evid. 403.

Giving a false address to the Retirement Board constituted a part, although not an essential or even significant part of McNeill's scheme to defraud. Another reason for admission under Fed.R.Evid. 404(b) is the relevance of this false statement to McNeill's intent to defraud, especially given that at trial McNeill attributed to carelessness or mistake the inconsistencies concerning his accident report, his backdated documents, and his list of witnesses who did not witness his alleged fall. McNeill is not likely to have mistakenly or absentmindedly made a false statement about his address. This false statement tends to show that McNeill intended to defraud the Retirement Board and did not do so by mistake or accident. *See, e.g., United States v. DeFillipo,* 590 F.2d 1228, 1240 (2d Cir.), *cert. denied,* 442 U.S. 920, 98 S.Ct. 2844, 61 L.Ed.2d 288 (1979).

Although admission of this evidence may have prejudiced McNeill by showing a propensity to lie,[7] the trial court did not abuse its discretion in failing to find that any danger of unfair prejudice substantially outweighed the probative value of the evidence. *See* Fed.R.Evid. 403; *United States v. Tunsil,* 672 F.2d 879, 880–81 (11th Cir.) (employing "clear abuse of discretion" standard in upholding trial court's ruling under Rule 403), *cert. denied,* 459 U.S. 850, 103 S.Ct. 110, 74 L.Ed.2d 98 (1982).

McNeill also finds error in the district court's refusal to exclude evidence concerning loans McNeill received from the City Credit Union, on which both McNeill and Thomas Gately, Retirement Board Chairman, sat as directors. McNeill showed at trial that he obtained the loans legally, and he contends that the government introduced evidence of the loans merely to conjure up an image of "City Hall cronyism", thus implying unfair advantage in obtaining his disability pension.

We disagree and hold that the district court properly admitted the evidence which, by showing the relationship between McNeill and Gately, indicated that McNeill could have believed that his disability pension request would receive little opposition from the Retirement Board. Gately had approved all of McNeill's loans, each of which listed an address different from the one McNeill gave at the Retirement Board hearing as the address he had "always" had. Gately had before him at the hearing the Workmen's Compensation file in which McNeill falsely listed Gately as a witness to McNeill's fall in a City Hall corridor. At the hearing, after McNeill gave an address and Gately asked if McNeill was changing it from a previous address, McNeill replied that the given address had "always" been his address. Gately said he would make the "correction".

The evidence of the Credit Union loans showed McNeill's relationship with Gately and Gately's readiness to allow what he knew was a false statement by McNeill to stand. The jury could glean from this evidence that McNeill believed that Gately's presence on the Retirement Board would compensate for various inconsistencies in McNeill's request for benefits. Considering that evidence of the Credit Union loans did not show any propensity to commit crimes or bad acts, the prejudicial effect in this context did not substantially outweigh the clearly probative value of that evidence.

---

**7.** Defendant claims that admission of the false address evidence forced defendant to explain that marital difficulties brought on by alcoholism forced him to move away from his wife, and that such an admission prejudiced him in the eyes of the jury. However, defendant raised the issue of alcoholism in his opening statement, prior to the ruling that admitted the false address evidence.

### III. Government Impeachment of Immunized Witnesses

■ McNeill next alleges that the district court erred in allowing, during direct examination of two witnesses by the government, inquiry concerning court orders granting the witnesses immunity and compelling them to testify. Both witnesses were McNeill's personal friends. One witness, Brian Leahy, was also executive secretary of the Retirement Board. The other, Francis Tracey, was listed as one of the witnesses to McNeill's alleged fall in City Hall.

McNeill moved to forbid the government from eliciting the fact of these immunity and compulsion orders on direct examination, stating that he would not impeach the witnesses' credibility on cross-examination. McNeill contends that this government tactic prejudiced him by arousing suspicions of widespread corruption in City Hall.

We hold that the trial court correctly permitted the government to elicit this information. Rule 607 of the Federal Rules of Evidence provides, "The credibility of a witness may be attacked by any party, including the party calling him". In *United States v. Winter,* 663 F.2d 1120, 1134 (1st Cir.1981), *cert. denied,* —— U.S. ——, 103 S.Ct. 1249, 75 L.Ed.2d 479 (1983), we held that evidence of an immunity agreement may be introduced on direct examination. Although the defendant in *Winter* had made clear his intention to impeach the credibility of the witness on cross-examination, whereas here McNeill stated that he would not do so, this factual distinction does not diminish the benefit to the jury of having before it information relevant to its task of judging credibility and weighing testimony. *See United States v. Craig,* 573 F.2d 513, 519 (7th Cir.1978). The fact of immunity and compulsion orders aids the jury function regardless of whether defendant intended to attack the credibility of the witnesses. The witnesses' personal or professional ties to McNeill led the government to believe that an immunity grant and compulsion order would best insure that the witnesses testified (without pleading their Fifth Amendment right not to respond) truthfully (because their immunity grants would not bar a subsequent prosecution for perjury). We recognize that evidence of a grant of immunity may also have bolstered the witnesses' credibility, by showing their interest in telling the truth: they could not have incriminated themselves with the truth, but could have been prosecuted for perjury if they lied. However, as indicated above, the very need for the immunity and compulsion orders in this case undercut the credibility of these witnesses. That the government asked the witnesses to explain their understandings of the immunity agreements does not automatically constitute impermissible government vouching for the veracity of the witnesses. *See Winter,* 663 F.2d at 1134. In this context, the jury deserved an opportunity to draw its own inferences from the special circumstances under which these witnesses testified.

### IV. Use of the Mails and Intent to Use the Mails

Defendant makes two final arguments. First, he claims that the proof at trial did not show uses of the mails that were sufficiently closely related to the fraudulent scheme so as to fall within the statute's prohibition. McNeill was convicted on ten counts of mail fraud: one count for the mailing of a medical panel report to the Retirement Board, the remaining nine counts for the receipt of nine pension checks.

■ Without the receipt by the Board of the medical panel report, as required by statute, M.G.L. c. 32 § 7, McNeill could not have received his pension award. This mailing is thus "sufficiently closely related" to the alleged fraud to bring McNeill's conduct within the statute. *See United States v. Maze,* 414 U.S. 395, 399–400, 94 S.Ct. 645, 647–648, 38 L.Ed.2d 603 (1974); *United States v. Martin,* 694 F.2d 885, 890 (1st Cir.1982). The pension checks were the proceeds of the fraudulent scheme, and as such, they clearly were essential to the success of the scheme. Settled precedent indicates that McNeill's receipt of these checks

 

in the mail comes within the statute. *See Pereira v. United States,* 347 U.S. 1, 8, 74 S.Ct. 358, 362, 98 L.Ed. 435 (1954); *Martin,* 694 F.2d at 889–90.

Finally, defendant's argument that the court's instructions to the jury on the issue of intent conflicted with *Sandstrom v. Montana,* 442 U.S. 510, 99 S.Ct. 2450, 61 L.Ed.2d 39 (1979), has no merit. In *Sandstrom,* the Supreme Court held impermissible an instruction to the jury in a criminal case that "the law presumes that a person intends the ordinary consequences of his voluntary acts". Such a required presumption is different from the permissive inference the court allowed the jury to draw in this case. The district court clarified its instructions regarding the "intent" or "knowledge" element of the mail fraud offense by telling the jury:

> "A person has knowingly caused the mails to be used within the meaning of the statute when he does an act with knowledge that the use of the mails will follow in the ordinary course of business. In determining whether the defendant had knowledge that the use of the mails would follow in the ordinary course of business, you may consider whether or not the circumstances were such that use of the mails could reasonably be foreseen. The issue for you to decide, however, is not whether an ordinarily prudent person would have foreseen use of the mails in the ordinary course, but, instead, whether the defendant expected the mails to be used in the ordinary course for transmission of checks and the medical panel report."

This instruction does not require the jury to infer a presumed fact from proof of a predicate fact. The instruction did permit the jury to infer that McNeill knew that the mails would be used if the jury found that McNeill expected the mails to be used. The court specifically instructed the jury, here and elsewhere in the instructions, not to impute knowledge to McNeill from what the ordinarily prudent person would have foreseen. The reasonable juror would not have understood the instructions as requir-

ing the jury to employ a mandatory presumption. *Cf. Sandstrom,* 442 U.S. at 514, 99 S.Ct. at 2454. Since under the circumstances of this case the jury could rationally make the connection permitted by the inference, the instruction was entirely proper. *See, e.g., County Court v. Allen,* 442 U.S. 140, 157, 99 S.Ct. 2213, 2224, 60 L.Ed.2d 777 (1979); *McInerney v. Berman,* 621 F.2d 20, 23 (1st Cir.), *cert. denied,* 449 U.S. 867, 101 S.Ct. 201, 66 L.Ed.2d 85 (1980).

*Affirmed.*