Beatrice Johnson v. SSA          CV-02-37-B     01/21/03

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW HAMPSHIRE


**Beatrice A. Johnson**

    **v.**                                    Civil No. 02-037-B
                                         Opinion No. 2003 DNH 013

**Jo Anne B. Barnhart**


**MEMORANDUM AND ORDER**

On June 8, 2000, Beatrice A. Johnson filed an application with the Social Security Administration ("SSA") for Title II disability insurance benefits ("DIB"). Johnson alleges that she has been unable to work since April 20, 1999. The SSA denied her application initially and again on reconsideration. Johnson filed a timely request for rehearing on which administrative law judge ("ALJ") Matthew J. Gormley III held a hearing on May 10, 2001. The ALJ issued an opinion dated August 14, 2001 denying Johnson's application. Johnson appealed, but the Appeals Council denied her request for review of the ALJ's decision. At that point, the ALJ's decision became the final decision of the Commissioner of Social Security ("Commissioner").

Johnson brings this action pursuant to 42 U.S.C. § 405(g) (1991 & Supp. 2002) seeking judicial review of the denial of her application for DIB. Johnson argues, among other things, that the ALJ failed to consider her significant non-exertional limitations in determining whether or not she was disabled at Step Five. I agree and therefore grant Johnson's motion for an order reversing the decision of the Commissioner, Doc No. 14, and deny the defendant's motion for order affirming the decision of the Commissioner, Doc. No. 17.

## I.   BACKGROUND[1]

### A. Education and Work History

Johnson was forty-six years old when she applied for DIB in June 8, 2000. She has a General Educational Development diploma ("GED") which is a high school equivalency certificate awarded after passing an examination. Johnson worked primarily as an assembly worker in the jewelry and precision bearing businesses. Johnson left her last position as an assembly worker in 1999, when she contends she became disabled and could no longer work.

---

[1]   Unless otherwise noted, the background facts are taken from the Joint Statement of Material Facts (Doc. No. 18) submitted by the parties.

At that time, Johnson had cut her hours from eight hours a day, five days a week, to four hours a day, five days a week. Tr. at 79-80.[2]

## B. Medical Evidence

Johnson began to experience medical problems several years before she left her last position as an assembly worker. Beginning in 1994, Johnson sought medical treatment for left wrist and left shoulder discomfort and tingling. Her initial diagnosis was probable overuse syndrome associated with Johnson's position as an assembly worker. The overuse resulted in arm strain, bursitis[3], tendinitis[4] of the left shoulder, and lateral

---

[2] From September 20, 1999 until June 8, 2000, Johnson worked as a homemaker for a health care company. She left that position because she could no longer work. See Tr. at 90. The ALJ determined that there was insufficient evidence in the record to determine whether or not her position as a homemaker constituted "substantial gainful employment." Tr. 17.

[3] Bursitis: inflammation of a bursa (a sac or sac-like cavity filled with a viscid fluid and situated at places in the tissues at which friction would otherwise develop), occasionally accompanied by a calcific deposit in the underlying tendon. Dorland's Illustrated Medical Dictionary, (hereinafter "Dorland's") 254, 257 (29th ed. 2000).

[4] Tendinitis: inflammation of tendons and of tendon-muscle attachments. Dorland's, supra, at 1797.

epicondylitis.[5]  Tr. 337, 342, 343.

On January 15, 1996, Johnson visited Dr. Matthew J. Donovan complaining of shoulder pain.  Dr. Donovan referred Johnson to a rehabilitation institute because he felt Johnson would benefit from some intensive rehabilitation.  Tr. 106.  Johnson visited a rehabilitation institute on January 22, 1996 where she was evaluated by Dr. Nancy E. Johnson.[6]  Dr. Johnson noted, among other things, that Johnson had attended several treatments of physical therapy for her shoulder pain.  Tr. 186.  Dr. Johnson recommended advanced physical therapy.

On October 10, 1996, Johnson visited Dr. Dennis L. Swartout for a follow-up evaluation of her neck and shoulder pain.  Tr. 113.  Dr. Swartout referred to a computed tomography ("CT-Scan") of the cervical spine that revealed anterior cord compression. Id.

------

[5]  Lateral epicondylitis: an overuse syndrome caused by continued stress on the grasping muscles (extensor carpi radialis brevis and longus) and supination muscles (supinator longus and brevis) of the forearm, which originate on the lateral epicondyle of the elbow.  The Merck Manual of Diagnosis And Therapy, 505 (17th ed. 1999).

[6] Johnson testified that Dr. Nancy E. Johnson is her primary care physician and that she visited Dr. Johnson every couple months.  Tr. 25.

On October 16, 1996, Johnson underwent a Magnetic resonance imaging ("MRI") of the cervical spine, as ordered by Dr. Johnson. Tr 193. The MRI results showed cervical spondylosis[7] with spurring at C5-6, and more markedly, C6-7.

On November 13, 1996, Johnson visited Dr. Johnson for a follow-up for Johnson's left upper extremity symptoms. Dr. Johnson stated that x-rays revealed significant degenerative changes in the cervical spine. An electromyogram ("EMG"), a record of muscles at rest, had not revealed any significant abnormalities.

Johnson was seen by Dr. George W. Monlux on December 16, 1998. Based on his examination of Johnson, Dr. Monlux diagnosed Johnson with Fibromyalgia[8] and moderate cervical stenosis[9] as

---

[7] Cervical spondylosis: degenerative joint disease affecting the cervical vertebrae...intervertebral disks... ligaments and connective tissue, sometimes with pain or paresthesia radiating down the arms. Dorland's, supra, at p. 1684.

[8] Fibromyalgia: pain and stiffness in the muscles and joints that is either diffuse or has multiple trigger points. Dorland's, supra, at p. 673.

[9] Stenosis: an abnormal narrowing of a duct or canal. Dorland's, supra, at 1698.

well as possible left thoracic outlet syndrome[10] and bicep tendinitis on the left bicep. Dr. Monlux recommended that Johnson not return to her former work position in her employer's wash system for four weeks. Tr. 303. He indicated that she was otherwise released to work at essentially the sedentary exertional level with no restrictions on fine motor, and occasionally climbing and reaching. Dr. Monlux opined, regarding her long term prognosis, that Johnson has fairly prominent degenerative changes of her neck.

On March 21, 1997, Johnson visited Dr. Thomas J. Kleeman for a second opinion. Tr. 307-8. Dr. Kleeman reported that Johnson displayed tenderness in the middle and lower cervical spine that was aggravated by motion. Dr. Kleeman questioned the diagnosis of fibromyalgia and attributed the symptoms to overuse and de-conditioning. He noted that Johnson's medical records did not demonstrate a pathlogical basis for fibromyalgia. Dr. Kleeman

_____

[10] Thoracic outlet syndrome: any of a variety of neurovascular syndromes resulting from compression of the subclavian artery, the brachial plexis nerve trunks...by thoracic outlet abnormalities such as a dropping shoulder girdle, a cervical rib or fibrous band, an abnormal first rib, or occasionally compression of the edge of the scalenus anterior muscle. Dorland's, supra, at p. 1769.

-6-

did note a tenderness over the left anterior acromion,[11] as well as tenderness over the lateral epicondyle.

On June 12, 1998, Dr. Johnson recommended that Johnson receive a functional capacity evaluation. At that appointment, Dr. Johnson noted that continuing assembly line work on a long term basis is simply going to lead to increasing "flares of symptoms." Tr. 252. On July 23, 1998, physical therapist Maria Gonzales evaluated Johnson's functional capacity to assess her ability to return to gainful employment. Tr. 258. Gonzales opined that Johnson was unable to return to her previous work, but was capable of sedentary and light work. Tr. 257-58. During a subsequent functional capacity evaluation on December 2, 1998, Johnson demonstrated a work capacity for physical activity at the light to medium exertional level.

Johnson visited Dr. Catherine Hawthrone complaining of painful neck, left shoulder, left elbow, and headaches on April 14, 2000. Dr. Hawthorne examined Johnson and found that she had tenderness in her cervical spine and left elbow. Dr. Hawthorne

---

[11] <u>Acromion</u>: the lateral extension of the spine of the scapula, projecting over the shoulder joint and forming the highest point of the shoulder. <u>Dorland's</u>, <u>supra</u>, at p. 21.

recommended, among other things, that Johnson be conscious of her posture and body mechanics at work, limit her activities at or above the shoulder level and avoid pushing, pulling or lifting more than ten pounds.

During the time period between May 31, 2000 and October 2, 2000, Johnson continued to be examined for cervical discomfort, degenerative disk disease and left shoulder and arm pain. Johnson had a follow-up appointment with Dr. Johnson on February 20, 2001. Dr. Johnson reported that Johnson continued to complain of neck and shoulder pain. Dr. Johnson noted that they had not been successful with prescribed medications, but that physical exercise did seem to result in an overall decrease in Johnson's symptoms.

## D. Treating Physician's RFC Assessment

On March 12, 2001, Dr. Johnson rendered an assessment of Johnson's ability to perform work-related activities. Dr. Johnson indicated that Plaintiff's impairment affected her ability to lift/carry and she was restricted to lifting a maximum of ten pounds both frequently and occasionally. Dr. Johnson, however, considered Johnson to be unrestricted as to her abilities to sit, stand and walk. Dr. Johnson further opined

that Johnson was capable of climbing and balancing frequently, but was limited only to occasional stooping, crouching, kneeling or crawling. Dr. Johnson indicated that Johnson should not perform any reaching above shoulder level and was limited in her ability to push/pull. Dr. Johnson also determined that Johnson should not do anything that required prolonged neck flexion for more than two hours per day, neck stretches of more than twenty minutes and no "repetitive motion with both shoulders." Tr. 335.

D. **Non-Treating Physician**

On May 13, 2000, Dr. Joseph R. Cataldo completed a residual physical functional capacity assessment of Johnson in connection with Johnson's application for benefits. Dr. Cataldo, a medical consultant to the New Hampshire Disability Determination Services ("DDS"), assessed Johnson's work capabilities after reviewing the medical evidence of record. Dr. Cataldo found that Johnson could occasionally and frequently lift ten pounds. He determined that she could stand and walk for about six hours in an eight hour work day and sit for the same. Dr. Cataldo found that Johnson had unlimited push and pull abilities, but was limited in her ability to lift and/or carry. Dr. Cataldo opined that Johnson could only occasionally climb, balance, stoop, kneel, crouch, and

crawl. Tr. 321. Dr. Cataldo determined that Johnson's reaching in all directions was limited and she should avoid repetitious overhead reaching movement of the left shoulder. Tr. 322-23.

Dr. Cataldo noted Johnson's long history of neck and left upper extremity pain, as well the various diagnostic impressions from her treating sources. Dr. Cataldo determined, based on the treatment notes and reported findings, that Johnson's allegations of symptoms were credible, but they were "not credible for her ability to function." Tr. 326.

E. **Administrative Hearing**

On May 10, 2001, Johnson appeared before Administrative Law Judge Matthew J. Gormley, III (the "ALJ"). When asked to describe her typical day, Johnson stated that she would go to the grocery store, or visit with her daughter and children. Tr. 26. She stated that she could do the chores around the house, but that she had to do them slowly and carefully. Id. Johnson stated that she also prepared the meals and could drive, but that she avoided driving for more than an hour at a time. Tr. 29, 30.

The ALJ asked Johnson why she was disabled and Johnson responded that her vocational rehabilitation counselor and her doctor had told her that she should not be working due to the

condition in her neck and shoulders.  She later testified, however, that her vocational rehabilitation counselor wanted her to get a job or go to school to learn a trade.  Tr. 23, 27.  She further stated that she was in constant pain that by the end of the day the pain was at 9.5 on a 0-10 scale.  When asked if she could handle a nonstressful job that did not require her to use her left shoulder for overhead lifting, Johnson replied "yes, but I don't know what."  Tr. 28.  Johnson testified that she would likely be unable to work more than four hours a day due to the pain she experienced and because she could not "move properly."  Tr. 29.

## F.  ALJ's Decision

The ALJ applied the five-step sequential evaluation process under which disability applications are reviewed.  See 20 C.F.R. § 404.1520 (2002).  The ALJ found the Johnson carried her burden sufficiently at each of the first four steps in the process.[12] At step five, however, the ALJ found that Johnson was "not disabled" because she retained the capacity to perform work which

---

[12]  The ALJ found, at step one, that there was insufficient development in the record to determine whether Johnson's work after April 20, 1999 constituted "substantial gainful activity." He therefore continued the sequential evaluation process.

existed in significant numbers in the national economy. Tr. 14, 17. Specifically, although the ALJ found that Johnson had severe impairments, including degenerative disc disease of the cervical spine, and tendinitis/bursitis in the upper left extremity that precluded her from returning to her former employment, he found that Johnson retained the RFC to perform sedentary work. The ALJ further found that Johnson's non-exertional limitations were "no[t] significant" and went on to apply Rule 201.21 of the Medical-Vocational Guidelines (the "Grid"), 20 C.F.R. § 404 App. 2, Subpart P, Regulation No. 4 at 201.21. In determining that Johnson's claimed non-exertional limitations, including her testimony concerning the level of pain she feels, "no[t] significant," the ALJ found Johnson's statements about "her impairments and their impact on her ability to work . . . not entirely credible in light of the reports of the treating physician, [Johnson's] daily activities, and [her] history of work since the date of alleged onset." Tr. 15.

Based on an exertional capacity for sedentary work, the ALJ applied the GRID and concluded that given Johnson's age, education, and work experience, she "has not been under a disability . . . at any time through the date of this decision."

Tr. 18.

## II.  <u>STANDARD OF REVIEW</u>

After a final determination by the Commissioner denying a claimant's application for benefits and upon a timely request by the claimant, this court is authorized to: (1) review the pleadings submitted by the parties and the transcript of the administrative record; and (2) enter a judgment affirming, modifying, or reversing the Commissioner's decision.  <u>See</u> 42 U.S.C.A. § 405(g).  The court's review is limited in scope, however, as the Commissioner's factual findings are conclusive only if they are supported by substantial evidence.  <u>See</u> <u>id.</u>; <u>Irlanda Ortiz v. Sec'y of Health & Human Servs.</u>, 955 F.2d 765, 769 (1st Cir. 1991).  The Commissioner is responsible for settling credibility issues, drawing inferences from the record evidence, and resolving conflicting evidence.  <u>See</u> <u>Irlanda Ortiz</u>, 955 F.2d at 769; <u>Frustaglia v. Sec'y of Health & Human Servs.</u>, 829 F.2d 192, 195 (1st Cir. 1987); <u>see also</u> <u>Tsarelka v. Sec'y of Health & Human Servs.</u>, 842 F.2d 529, 535 (1st Cir. 1988) ("[W]e must uphold the [C]ommissioner's conclusion, even if the record arguably could justify a different conclusion, so long as it is

-13-

supported by substantial evidence.") (citations omitted).

Therefore, the court must "'uphold the [Commissioner's] findings

. . . if a reasonable mind, reviewing the evidence in the record

as a whole, could accept it as adequate to support [the

Commissioner's] conclusion.'" Irlanda Ortiz, 955 F.2d at 769

(quoting Rodriguez v. Sec'y of Health & Human Servs., 647 F.2d

218, 222 (1st Cir. 1981)).

While the ALJ's findings of fact are conclusive when

supported by substantial evidence, they "are not conclusive when

derived by ignoring evidence, misapplying the law, or judging

matters entrusted to experts." Nguyen v. Charter, 172 F.3d 31,

35 (1st Cir. 1999) (per curiam) (citations omitted). If the

Commissioner has misapplied the law or has failed to provide a

fair hearing, deference to the Commissioner's decision is not

appropriate, and remand for further development of the record may

be necessary. See Carroll v. Sec'y of Health & Human Servs., 705

F.2d 638, 644 (2d Cir. 1983); see also Slessinger v. Sec'y of

Health & Human Servs., 835 F.2d 937, 939 (1st Cir. 1987) ("The

[Commissioner's] conclusions of law are reviewable by this

court.") I apply these standards in reviewing the issues Johnson

raises on appeal.

### III.  ANALYSIS

### A.  General SSA Principles

Under the Social Security Act (the "Act"), an individual seeking DIB is "disabled" if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423 (d)(1)(A) (1991 & Supp. 2002).  The Act instructs the ALJ to apply a five-step sequential analysis to determine whether a claimant is disabled.[13]

At step five, the Commissioner must show that despite an impairment or impairments that preclude the claimant from returning to her past relevant work, "that there are jobs in the national economy that [the] claimant can perform."  Heggarty v. Sullivan, 947 F.2d 990, 995 (1st Cir. 1991) (per curiam); see

---

[13] The five-step sequential analysis requires the ALJ to determine: (1) whether the claimant is presently engaged in substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals a listed impairment; (4) whether the impairment prevents the claimant from performing past relevant work; and (5) whether the impairment prevents the claimant from doing any other work.  See 20 C.F.R. § 404.1520 (2002).

also <u>Keating v. Sec'y of Health & Human Servs.</u>, 848 F.2d 271, 276 (1st Cir. 1988) (per curiam) (citations omitted).  In making this determination, "the standard is not employability, but capacity to do the job; not whether claimant could actually locate a job, but whether health limitations would prevent him from engaging in substantial gainful work."  <u>Keating</u>, 848 F.2d at 276 (citing <u>Miranda v. Sec'y of Health, Education, and Welfare</u>, 514 F.2d 996, 998 (1st Cir. 1975) (internal quotation marks omitted).

The ALJ is responsible for ensuring that "an adequate record is developed during the disability hearing consistent with the issues raised."  <u>Hawkins v. Chater</u>, 113 F.3d 1162, 1164 (10th Cir. 1997).  Where it is within the power of the ALJ "without undue effort," he must fill in an undeveloped record "where there are gaps in the evidence necessary to a reasoned evaluation of the claim."  <u>Heggarty</u>, 947 F.2d at 997 (citations omitted).

**B.**   **<u>The ALJ Failed to Adequately Consider Johnson's<br>Non-Exertional Limitations</u>**

Johnson contends that the ALJ's decision should be reversed arguing, among other things, that the decision was erroneous because the ALJ erred in evaluating Johnson's RFC.  Johnson contends that the record demonstrates the existence of several

non-exertional limitations that should have been considered when evaluating her RFC.

An RFC determination specifies what a claimant can do in a work setting despite his or her limitations.  20 C.F.R. § 404.1545 (2002).  The ALJ must perform a "function-by-function" assessment of the claimant's ability to engage in work-related activities when determining his or her RFC.  See Social Security Regulation ("SSR") 96-8p, 1996 WL 374184, at *3 (1996); see also Ferraris v. Heckler, 728 F.2d 582, 586-87 (2d Cir. 1984).  The ALJ must address, not ignore, relevant evidence, especially when that evidence supports the claimant's cause.  See Nguyen, 172 F.3d at 35.  In addition, the ALJ must specify the evidentiary basis for his RFC determination.  SSR 96-8p, 1996 WL 374184, at *7; see also White v. Sec'y of Health & Human Servs., 910 F.2d 64, 65 (2d Cir. 1990) (An ALJ's failure to specify a basis for the RFC determination is a sufficient reason to vacate a decision of the Commissioner).

As described above, the ALJ "directly applied" the Grid when determining that Johnson was "not disabled."  Tr. 16.  Johnson urges that the ALJ's sole reliance on the Grid was improper because Johnson had significant non-exertional limitations that

the ALJ ignored.  I agree.  The purpose of the Grid is to measure exertional, or strength, limitations of the claimant in a streamlined fashion.  See 20 C.F.R. § 404 App. 2, Subpart P, Regulation No. 4 at 201.21; Oritz v. Sec'y of Health & Human Servs., 890 F.2d 520, 524 (1st Cir. 1989). If a claimant, such as Johnson, has other non-exertional limitations, the Grid may not be applied unless the ALJ makes a finding that the non-exertional limitations are "not significant."  See Heggarty, 947 F.2d at 995; Oritz, 890 F.2d at 524.  The ALJ found that the non-exertional limitations in this case were "not significant" and therefore directly applied the Grid.  The ALJ, however, did not adequately specify his evidentiary basis for finding that Johnson's non-exertional limitations were "not significant." Although the ALJ found Johnson's testimony concerning her pain, a non-exertional limitation, "not entirely credible," he also did not address Johnson's other non-exertional limitations found both in the DDS examination by Dr. Cataldo, and by her treating physician, Dr. Johnson.  Tr. 319-328, 331-335.

Dr. Johnson opined that Johnson had postural limitations and should only occasionally stoop, crouch, kneel and crawl.  In addition, Dr. Johnson found that Johnson had manipulative

-18-

limitations in her ability to reach, push and pull. Specifically, Dr. Johnson found that Johnson cannot reach above shoulder level. Dr. Johnson opined that Johnson should not have prolonged neck flexion and should not engage in any repetitive motion with both shoulders. Moreover, the DDS examination by Dr. Cataldo agreed with Dr. Johnson's RFC characterization with limitations on Johnson's ability to stoop, kneel, crouch and crawl. Dr. Cataldo found additional postural limitations in Johnson's ability to climb and balance. Tr. 321. Dr. Cataldo also agreed that Johnson should avoid repetitious movement of the left shoulder and avoid overhead reaching. No medical opinions in the record contradict the non-exertional limitations found by Dr. Cataldo and Dr. Johnson.

The ALJ references both Dr. Cataldo and Dr. Johnson's examinations in his opinion. However, he does not discuss Johnson's non-exertional postural and reach limitations; nor does he discredit these opinions in finding all of Johnson's non-exertional limitations "not significant." The additional non-exertional limitations may, depending on the weight the ALJ assigned to the medical opinions, impact the number of jobs within the sedentary-work category that Johnson could perform.

-19-

The ALJ should have either discredited the physicians' opinions, if he felt they lacked credibility, or called a vocational expert to determine the extent to which the non-exertional limitations affected her ability to perform sedentary work. Because the ALJ did not properly explain his decision to discount Johnson's claimed non-exertional limitations, he could not properly use the Grid in determining that she was not disabled.[14] See Heggarty, 947 F.2d at 996 (Use of the Grid by ALJ improper where the ALJ did not adequately take into consideration other non-exertional limitations).

## CONCLUSION

I conclude that because the ALJ failed to make specific findings regarding Johnson's non-exertional limitations and the effect these limitations may have on her ability to work, I must

---

[14] Johnson also argues that the Commissioner has not met his burden at step five because he did not show that Johnson can *maintain* employment. On remand, the ALJ should consider whether Johnson has the ability to perform sustained work activities on a regular and continuing basis, as required by the SSR. See the Social Security Regulation definition of RFC. See SSR 96-8p, ("RFC is the individual's maximum remaining ability to do *sustained* work activities in an ordinary work setting on a *regular and continuing basis*." A "regular and continuing basis" means 8 hours a day, for 5 days a week).

remand Johnson's claim for benefits to the Commissioner.  On remand, the Commissioner shall explicitly address the non-exertional limitations and the physicians' capacity assessments detailing them.  If any of the non-exertional limitations identified in these assessments are deemed to be significant, the Commissioner may not directly apply the Grid and instead shall, consistent with SSR 96-9p, consult with a vocational expert to determine the erosion of Johnson's sedentary occupational base.

For the forgoing reasons, Johnson's motion to reverse the decision of the Commissioner (Doc. No. 14) is granted, and the Commissioner's motion to affirm her decision (Doc. No. 17) is denied.  I vacate the ALJ's decision, pursuant to sentence four of 42 U.S.C. § 402(g), and remand this case for further proceedings in accordance with this Memorandum and Order.  The Clerk of the Court shall enter judgment in accordance with this order and close the case.

SO ORDERED.

_____
Paul Barbadoro
Chief Judge

January 21, 2003
cc:  David L. Broderick, Esq.
     Francis M. Jackson, Esq.

-21-